# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Case No. 1:24-cv-658

**S.S.** by and through her guardian Rumina
Slazas, **J.S.** by and through his guardian
Rumina Slazas, and **RUMINA SLAZAS**,

Plaintiffs,

v.

**MOORE COUNTY**,

Defendant.

**COMPLAINT**
**(Jury Trial Demanded)**

## INTRODUCTION

1. Plaintiffs are members of a family and each is a person with disabilities. Rumina Slazas ("Plaintiff mother", "Ms. Slazas") is the mother of Plaintiffs J.S. and S.S. ("Plaintiff children").

2. Defendant Moore County's Department of Social Services took custody of J.S. and S.S. in August of 2022 when Plaintiff mother was temporarily hospitalized due to cancer treatment, and did not return them when she recovered and was ready and able to parent them.

3. Ms. Slazas was in complete remission for almost a year while awaiting the return of her children.

1

4. Defendant's delay and failure to reunite Plaintiff children with Ms. Slazas relied on unwarranted assumptions and stereotypes about her ability to parent as a person with a disability and violated her rights under the Americans with Disabilities Act ("ADA").

5. After Plaintiff children entered Defendant's custody, Defendant unnecessarily institutionalized J.S. and S.S.

6. On information and belief, Defendant also took no steps to ensure S.S. had communication devices or other communication supports while it was her custodian.

7. North Carolina offers comprehensive alternatives to institutional care for children with disabilities through Medicaid, including Medicaid waiver programs like the Innovations Waiver (which provides a budget of $184,000.00 per year for home and community-based services).

8. Defendant chose not to utilize the Innovations Waiver slot granted to S.S. or other available community-based services for Plaintiff children, and instead chose to institutionalize Plaintiff children.

9. It has been the law of the land for more than two decades that public entities like Defendant must provide home and community-based care for children with disabilities in its custody rather than institutionalizing them. *See Olmstead v. L.C.*, 527 U.S. 581 (1999) (holding that unnecessary institutionalization constitutes disability discrimination and violates the ADA).

10. Defendant's failure to utilize community-based services and placements for Plaintiff children – when these were available options through Medicaid and other public

funding – is disability-based discrimination and violated Plaintiff children's rights under the ADA.

11. The human cost and harms caused by Defendant's actions cannot be overstated. Separating a mother from her children is devastating. Failing to provide children care in home-like, integrated community settings is known to have life-long effects.

12. Throughout Defendant's custody of J.S. and S.S., Defendant ignored information from medical and disability services professionals about the services and supports appropriate for Plaintiff children and about Plaintiff mother's recovery from cancer. Defendant acted with deliberate indifference to Plaintiffs' rights under the ADA and with disregard for the children's long-term wellbeing by institutionalizing them and unreasonably delaying their return to their mother.

## JURISDICTION AND VENUE

13. Plaintiffs' claims of disability discrimination are made pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.C.S. § 12131 *et seq.*

14. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

15. Declaratory relief is authorized by 28 U.S.C. §§ 2201, 2202.

16. Compensatory damages are authorized by 28 U.S.C. § 12133.

17. Venue is appropriate in the United States District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events

3

and omissions that gave rise to Plaintiffs' claims occurred within this District and Defendant's principal office and place of business is in this District.

**PARTIES**

18. Rumina Slazas is the mother of J.S. and S.S.

19. Ms. Slazas has a history of cancer, which substantially limited her major bodily function of normal cell growth when her cancer was active.

20. At all times relevant to this action, including while her children were in Defendant's custody, Ms. Slazas was a qualified individual with a disability and/or record of disability, and was regarded by Defendant as a person with a disability.

21. J.S. is a 16-year-old boy with intellectual and physical disabilities that substantially limit him in walking, balancing, and caring for himself.

22. J.S. brings this action through his mother and natural guardian, Rumina Slazas.

23. At all times relevant to this action, including while he was in Defendant's custody, J.S. was a qualified individual with a disability.

24. S.S. is a 15-year-old girl with intellectual and developmental disabilities, and has an expressive and receptive communication disorder and is often referred to as "non-verbal." Her oral communication consists primarily of single words and scripts (the repetition of words, phrases, or sounds from other's speech), and in the absence of communication aids and services, she makes her needs known primarily through behavior. S.S. is substantially limited in interacting with others, caring for herself, communicating, and speaking.

4

25. S.S. brings this action through her mother and natural guardian, Rumina Slazas.

26. At all times relevant to this action, including while she was in Defendant's custody, S.S. was a qualified individual with a disability.

27. Defendant is a public entity responsible for child protective services in Moore County, North Carolina.

28. Defendant has assigned responsibility for child protective services to Moore County Department of Social Services ("MCDSS"), a department of county government with no independent legal capacity to be sued separately from Defendant.

29. Defendant took custody of S.S. from on or about August 8, 2022 to August 8, 2023, and of J.S. from on or about August 8, 2022 to December 7, 2023, during which time it had legal authority and did in fact make decisions about placement and services for J.S. and S.S. challenged herein.

## STATEMENT OF FACTS

30. Until July 8, 2022, Plaintiff children lived at home with Plaintiff mother in Moore County, North Carolina.

31. On July 8, 2022, Ms. Slazas was rushed from Moore County Regional Hospital to Duke University Hospital in Durham, North Carolina, where she was diagnosed with cancer and started inpatient treatment immediately.

32. On or about August 8, 2022, while Plaintiff mother remained hospitalized, Plaintiff children were taken into custody by Defendant.

5

33. Ms. Slazas was declared in complete remission from cancer on August 16, 2022 and returned home.

34. Ms. Slazas continued with her doctor's recommended medical care through the remainder of 2022 and was fully healed and able to care for her children by early 2023, and possibly earlier with supports in place.

35. On information and belief, Ms. Slazas' particular type of cancer has a less than 10% chance of reoccurrence or relapse.

36. Ms. Slazas has been cancer free for almost two years.

37. When Ms. Slazas inquired about the return of her children, Defendant refused, stating that she might have cancer again in the future, a belief that was contrary to the medical opinion Ms. Slazas' treating professionals provided to Defendant.

38. Between August of 2022 and December of 2023, Ms. Slazas consistently and repeatedly fought for the return of her children.

39. S.S. was finally returned to her mother's custody on August 8, 2023 after a year in Defendant's custody.

40. J.S. was returned to his mother's custody months later on December 7, 2023 after nearly a year and a half in Defendant's custody.

41. Defendant's delay in returning Plaintiff children to Ms. Slazas trespassed her civil rights and caused her suffering.

42. Defendant acted with deliberate indifference to Ms. Slazas' federally protected rights under the ADA to parent free from Defendant's discriminatory assumptions and unfounded beliefs about her disability, record of disability, or perceived disability.

6

**Defendant's Custody of J.S.**

43. Upon assuming custody of J.S. on August 8, 2022, Defendant decided almost immediately to place J.S. in an intermediate care facility (ICF).

44. ICF's are by state and federal definition, institutional settings for individuals with intellectual disabilities.

45. Upon information and belief, Defendant did not pursue placement in a non-institutional setting for J.S., despite the fact that family-like, integrated community-based services are preferred to congregate, institutional settings, both clinically and under state and federal law.

46. While Defendant pursued an ICF placement in coordination with Sandhills LME/MCO, the local entity tasked with coordination and provision of publicly-funded disability services by North Carolina's Department of Health and Human Services, J.S. had no place to go and lived for a period in Defendant's MCDSS offices.

47. On August 16, 2022, J.S. was accepted for placement at Greater Image ICF and was moved from the MCDSS offices into the ICF that same day.

48. Upon information and belief, while J.S. lived at Greater Image ICF, Defendant did not make arrangements for physical therapy or other needed services for his physical disabilities, such as an exercise ball to maintain core strength.

49. Additionally, Defendant did not transport J.S. to Applied Behavioral Analysis (ABA) therapy, a service that Sandhills LME/MCO agreed to provide for him.

50. Due to his disabilities, J.S. is not able to independently toilet. The ICF restricted J.S.'s access to his Chromebook (a small laptop), a primary tool he uses to self-

soothe, and redesignated it as a "reward" for independent toileting. Upon information and belief, the result was to cause J.S. to become more anxious about his ability to access and use his Chromebook.

51. Upon information and belief, J.S. was slapped in the face by an employee at the ICF and reported the abuse to his school.

52. Before Defendant took custody of J.S., he was an extremely social teen who loved to explore and meet new people. After being separated from his mother and placed in the ICF for over a year, J.S. no longer trusts people easily and seeks constant reassurance that he will not have to go back to the ICF. He is protective of his belongings and gets stressed that things will be taken away from him, particularly his Chromebook. When his stress levels escalate, J.S. self-harms, hitting himself in the head or face sometimes hard enough to bruise. He did not self-harm before entering Defendant's custody.

53. Upon information or belief, Defendant did not pursue non-institutional placement for J.S. after he moved into Greater Image ICF.

54. J.S. lived in this facility until December 7, 2023 when Defendant voluntarily consented to his return to the custody of his mother and he resumed living in his family home in the community.

55. At all times J.S. was in the custody of Defendant, living in the community was appropriate for J.S.

56. At all times J.S. was in the custody of Defendant, neither J.S. nor his mother opposed having him live in the community.

8

57. At all times J.S. was in the custody of Defendant, J.S. could be reasonably accommodated in the community as demonstrated by him living in the community immediately before and immediately after the time he was in custody.

58. Defendant's delay in returning J.S. to the community, and its delay in returning him to his mother's care, trespassed his civil rights and caused him suffering.

59. Defendant acted with deliberate indifference to J.S.'s federally protected rights under the ADA to live in the community in the most integrated setting appropriate to his needs, and to make accommodations, if necessary, for him to do so.

**Defendant's Custody of S.S.**

60. Upon assuming custody of S.S. on August 8, 2022, Defendant decided almost immediately to place S.S in an institution.

61. On or about August 9, 2022, Defendant told Sandhills LME/MCO, the local entity tasked with coordination and provision of publicly-funded disability services, that it wanted to place S.S. in a residential facility or psychiatric residential treatment facility ("PRTF").

62. Sandhills informed Defendant that a PRTF placement required a clinical care assessment ("CCA") and a mental health diagnosis.

63. S.S. had no current CCA on file and no diagnosed mental illness at the time Defendant requested a PRTF for S.S. Defendant's decision to place S.S. in an institution was not based on a clinical opinion but on biases, stereotypes, and assumptions about S.S. and her disabilities.

64. At Defendant's direction, Sandhills began searching for placements for S.S. in a PRTF or similar residential center, but multiple PRTFs declined to accept S.S. because she had no current CCA, no billable mental health diagnosis, and/or because their facilities are geared towards mental health treatment and are not intended or equipped to care for individuals with intellectual and developmental disabilities like S.S.

65. On or about August 10, 2022, Defendant picked S.S. up from a temporary placement at the home of one of her teachers and brought S.S. to the Emergency Department of Moore Regional Hospital complaining of her "aggressive behavior."

66. The hospital promptly released S.S. because it found her behaviors to be "consistent with her disabilities and current circumstances."

67. S.S. was taken to Defendant's MCDSS offices to live there until Defendant identified a placement.

68. On or about August 12, 2022, Daymark Recovery Services performed a CCA of S.S. at the request of Defendant. The CCA confirmed S.S.'s developmental disability; no mental health diagnosis was identified.

69. Per Defendant's stated desire to place S.S. in a PRTF, Sandhills forwarded the CCA along with inquiries about admission to PRTFs. A representative of a PRTF in Virginia telephoned Sandhills to stress that S.S. did not have a mental health diagnosis and that such a diagnosis was needed to bill for treatment at a PRTF because of the nature of PRTFs as mental health facilities.

70. On August 15, 2022, Defendant communicated with Daymark Recovery Services about the need to identify a mental health diagnosis for S.S. so that she would be eligible for PRTF placement.

71. On August 17, 2022, Defendant dropped S.S. off at UNC Health's pediatric emergency department ("UNC Health") in Chapel Hill, North Carolina for "aggressive behaviors."

72. Defendant took S.S. from Moore County to UNC Health on August 17, 2022 because the local Emergency Department at Moore Regional refused to admit S.S., just as it had refused to admit her 7 days prior.

73. Just like Moore Regional Hospital, UNC Health determined that S.S. did not meet the clinical criteria for psychiatric inpatient admission because she lacked a mental health condition.

74. However, when UNC Health asked Defendant to pick S.S. up from the emergency department, this time Defendant refused.

75. S.S. would ultimately remain in "limbo" in the emergency department for almost 9 months because Defendant refused to pick her up.

76. On August 19, 2022, Sandhills contacted Defendant and restated that S.S. did not have a billable mental health diagnosis needed for PRTF placement; despite an apparent lack of medical documentation supporting or indicating a mental health diagnosis, Defendant told Sandhills that S.S. had a history of depression which was then incorporated into the CCA.

11

77. On August 29, 2022, S.S. was approved for an emergency slot for the Innovations Waiver, a Medicaid program for individuals with intellectual and developmental disabilities that comes with a $184,000.00 yearly budget for services expressly intended to permit them to live at home or in a home-like environment as an alternative to institutional care.

78. Rather than use the emergency slot to obtain community-based services, Defendant continued to search for a PRTF or other institutional placement for S.S. and left her in the UNC Health emergency department while it continued to search.

79. On August 30, 2022, based on Defendant's advocacy for institutionalization, S.S. was placed on a waitlist at Springbrook PRTF in Traveler's Rest, South Carolina. The waitlist was estimated to be 3–5-months long.

80. Despite repeated requests from UNC Health staff to have Defendant pick S.S. up from the hospital, S.S. remained in the emergency department in conditions that approximated solitary confinement:

- She lived alone in a windowless cubicle with a curtain for a "door."

- She could not see the outside and had no access to sunlight or fresh air.

- She had few opportunities to leave her cubicle.

- She was unable to engage in physical activity or outdoor play.

- She had few interactions with other people throughout the day.

- She did not receive educational services for at least 6 months.

- She did not have access to communication technology and had limited access to sensory-regulating tools, which greatly diminished her ability to communicate and participate in her own care.

- She did not receive disability-related services such as speech therapy, occupational therapy, or Applied Behavior Analysis (ABA) therapy, for at least 6 months and received limited services thereafter.

- She lacked consistent care providers due to staffing patterns.

81. On September 6, 2022, while S.S. remained in the UNC Health pediatric emergency department, S.S.'s former special education teacher at Moore County Schools and her husband were approved for placement of S.S. in their home. S.S. was also approved for potential placement in a group home in the community.

82. Defendant refused these community placements, choosing instead to leave S.S. at the hospital to await admission to a clinically-inappropriate psychiatric facility in South Carolina.

83. On October 13, 2022, UNC Health told Sandhills LME/MCO that S.S. was pacing up and down the hallways and screaming.

84. On October 19, 2022, Defendant told Sandhills not to continue to look for placement for S.S., ostensibly because she was on the waitlist and destined for Springbrook PRTF at some undetermined time in the future.

85. Despite Defendant's prior rejection of community placements and insistence on Springbrook PRTF, Sandhills kept searching for community placement for S.S.

13

86. On November 9, 2022, Sandhills informed Defendant that they would search for an Alternative Family Living (AFL) placement for S.S. using her Medicaid Innovations Waiver slot. AFLs are community settings where a child with an intellectual disability can live within a family unit that is trained to support their disabilities.

87. The care staff at UNC Health, now familiar with S.S., agreed with Sandhills that an AFL would be a "great option" for S.S.

88. Defendant refused to consider an AFL placement as it would "only want PRTF or higher," electing instead to leave S.S. in the busy emergency department knowing that she was decompensating and distressed by the conditions.

89. Despite being informed by Sandhills that additional, more intensive services known as "wrap-around services" could be utilized to support S.S. in an AFL, Defendant refused to consider AFL placement.

90. In late November 2022, Sandhills documented that S.S. "remains at UNC hospital. Room has no windows. Sandhills not sure if she has been outside since being admitted to the hospital. .... Discussion about behaviors in response to extended hospital stay with very little normal interactions" and that S.S. was decompensating and did not want to eat.

91. By March 1, 2023, UNC Health nursing staff, who had daily firsthand experience of S.S.'s situation, were complaining of moral distress owing to S.S.'s continued confinement and worries that S.S. was "being raised" within UNC Health's emergency department.

14

92. On April 11, 2023, UNC Health informed Defendant that S.S.'s extended isolation was impacting her ability to function and that problematic behaviors were emergent.

93. On April 12, 2023, Sandhills arranged an evaluation of S.S. for purposes of creating a behavior intervention plan. The evaluator observed that S.S. communicated through behavior, such as aggression when she was overstimulated, and that the recommended interventions and therapies she needed could not be provided in an emergency department.

94. On April 10 and 19, 2023, two independent speech pathologists and an occupational therapist evaluated S.S. and clinically confirmed that she had experienced significant mental and physical decompensation and regressions in her skills as a result of the months-long deprivation of human contact, physical activity, and sensory stimulation in the emergency department.

95. Upon information and belief, Defendant did not make arrangements to provide S.S. with communication devices or take any other steps to assist her communications, make arrangements for disability-specific services such as Applied Behavioral Analysis (ABA) therapy, or otherwise make accommodations for her known disability-related needs in the emergency department.

96. On May 9, 2023, Defendant transferred S.S. to Springbrook PRTF, an approximately 4 hour drive each way from the Slazas' home in Moore County.

97. During S.S.'s placement at Springbrook PRTF, Ms. Slazas observed, documented, and reported bruises and bite marks on S.S.'s body that Springbrook staff

15

could not explain. Ms. Slazas also reported to Springbrook that during family visits S.S.'s eyes kept rolling into the back of her head and that it looked like a seizure or overmedication. In response, Defendant told Springbrook PRTF to limit parental visits with S.S.

98. S.S. lived at Springbrook PRTF until August 8, 2023 when Defendant consented to her return to the custody of her mother and family home.

99. During the time she was in Defendant's custody, S.S. regressed from independent toileting to wearing diapers. S.S. frequently has accidents, an entirely new behavior that developed after her time in Defendant's custody.

100. Before she was in Defendant's custody, S.S. was curious about interacting with others and visiting new places; now she is cautious about leaving her home for too long out of fear she will not be allowed to return.

101. Since returning from Defendant's custody, S.S. requires constant reassurance from her mother that they will not be separated. For example, when S.S. saw someone who looked like the MCDSS employee who removed her from her home, she became extremely anxious and required reassurance from her mother.

102. Prior to Defendant's custody S.S. had a few cavities filled at the age of three. Ms. Slazas helped care for S.S.'s teeth by brushing them with her, holding the tooth brush and helping S.S. with the movements. With her mother's assistance, S.S. did not need any dental work from ages three to fifteen. On information and belief, Defendant did not ensure that S.S. had appropriate dental care. Since returning home from Defendant's

16

custody, S.S. has required extensive dental work including: two crowns, four fillings, and extractions of two teeth.

103. Upon information and belief, Defendant did not pursue non-institutional placement for S.S. after transporting her to UNC Health or Springbrook PRTF.

104. At all times S.S. was in the custody of Defendant, living in the community was appropriate for S.S.

105. At all times S.S. was in the custody of Defendant, S.S. and her mother did not oppose her living in the community.

106. At all times S.S. was in the custody of Defendant, S.S. could be reasonably accommodated in the community as demonstrated by her living in the community immediately before and immediately after the time she was in custody.

107. Defendant's delay in returning S.S. to the community and to her mother's care trespassed her civil rights and caused her suffering.

108. Defendant acted with deliberate indifference to S.S.'s federally protected rights under the ADA to live in the community in the most integrated setting appropriate to her needs, and to make accommodations, if necessary, for her to do so.

109. Defendant acted with deliberate indifference to S.S.'s federally protected rights under the ADA to auxiliary aids and services when needed for effective communication.

**Home and Community-Based Services Available**

110. At all times relevant to this case, Plaintiff children were Medicaid beneficiaries and were eligible for comprehensive and preventive services through

17

Medicaid's Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") benefit for children up to age 21.

111. S.S. additionally received an emergency Innovations Waiver slot on August 29, 2022, a North Carolina Medicaid program for individuals with intellectual and developmental disabilities expressly intended to provide them the services needed to live at home or in a home-like environment rather than in an institution.

112. By North Carolina statute, Defendant may place children in its custody in community-based settings including the home of a parent, relative, nonrelative kin (an individual with a substantial relationship to the child), licensed foster home, or other home authorized by law to provide care. *See* N.C. Gen. Stat. § 7B-503(a).

113. Federal child welfare law strongly emphasizes the preference for placing children in the community by limiting the reimbursements available to Defendant when placing children in congregate care. *See* Family First Prevention Services Act (FFPSA), P.L. 115–123.

114. Defendant is empowered to request Medicaid and EPSDT benefits, the Innovations Waiver, and other publicly-funded home and community-based services to support the placement of children with significant disabilities in home and community-based settings.

115. Institutions do not provide greater safety, better promote child development, or achieve better long-term outcomes for children and they are far more costly than community-based care.

116. Yet Defendant consistently chose institutional services for Plaintiff children despite an array of non-institutional services that were available and were able to meet Plaintiff children's needs.

117. The services S.S. received at Springbrook PRTF are also available in the community in a non-institutional setting.

118. The services J.S. received at Greater Image ICF are also available in the community in a non-institutional setting.

119. Defendant's institutionalization of Plaintiff children denied them the opportunity to live in a home-like environment with nurturing and stable adults and appropriate care, which harmed Plaintiff children.

**Defendant's Deliberate Indifference**

120. On information and belief, Defendant knew its conduct was substantially likely to violate Plaintiffs' federally-protected rights and failed to change course with that knowledge.

121. Defendant chose to institutionalize Plaintiff children despite repeated recommendations from medical providers and disability services experts for home and community-based services and these providers and experts' opinion that institutional options were in direct contradiction to the children's needs and rights. Specifically, Defendant:

19

- was in possession of a written opinion from Plaintiff mother's healthcare providers that her cancer was in full remission but refused to return her children;

- had been told by Sandhills that S.S. did not meet criteria for a PRTF because she had no mental health diagnosis in her clinical assessment but insisted on placing her on a waitlist for admission to a PRTF almost immediately after obtaining custody of S.S.;

- had been told by UNC Health that S.S. did not meet criteria for in-patient admission but disregarded this information and left S.S. in the emergency department for nearly nine months despite UNC Health repeatedly telling them it was not an appropriate place for S.S.;

- was in possession of speech and occupational therapy assessments of S.S. explaining that S.S. did not need psychiatric services and that a PRTF would not provide the services she needed, but ignored these professional recommendations for community services to address S.S.'s developmental needs and proceeded to place her in a PRTF;

- was aware that S.S. has substantial limitations communicating, and on information and belief, was aware S.S. needed auxiliary aids and services to aid her communications but took no action to address her communication needs;

20

- had been told by Sandhills of other, community-based placement options for J.S. but Defendant maintained his placement in an ICF, an institution, throughout its custody of J.S.; and

- Sandhills repeatedly offered other, more integrated options for the children's placements that Defendant refused.

122. On information and belief, Defendant is aware of the ADA and its antidiscrimination requirements.

123. On information and belief, Defendant is aware of the 25 year-old *Olmstead* decision issued by the United States Supreme Court interpreting the ADA to require placement of children with disabilities in the most integrated setting appropriate to their needs.

124. On information and belief, Defendant knew that its actions illegally discriminated against Plaintiffs based on their disabilities:

- North Carolina's *Olmstead* plan addresses the need of county child welfare agencies to reduce PRTF usage and increase home and community-based services and placements to be compliant with the ADA;

- Defendant has received numerous "Dear DSS Director" letters from the state Department of Health and Human Services advising that counties can no longer seek child welfare funds reimbursement for children placed in congregate settings because of federal law changes; and

21

- the North Carolina Department of Health and Human Services provides training to local county DSS offices, including recent training on the rights of individuals with disabilities under the ADA and the array of community-based services available to children with mental health and intellectual/developmental disabilities.

125. Defendant acted with deliberate indifference to Plaintiff children's federally protected right to equipment and services needed to reap the full benefit of Defendant's child protective services and by refusing to place them in the most integrated setting available appropriate to their needs.

126. The decision of Defendant to continue institutionalizing Plaintiff children after their mother recovered from cancer and was ready to resume caring for them was made with deliberate indifference to Plaintiff children's federally protected rights to live in the most integrated setting, their family home in the community.

127. Defendant's delay in returning Plaintiff children to the community and ultimately to their home trespassed Plaintiffs' civil rights and caused them suffering.

**CLAIM FOR RELIEF**
**TITLE II OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12131, *et seq.***

128. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specally alleged herein.

129. Title II requires, inter alia, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of

22

the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *See* 42 U.S.C. § 12132.

130. Defendant is a "public entity" as used in Title II of the ADA. *See* 42 U.S.C. § 12131(1)(B).

131. Child protective services provided by Defendant are services, programs, or activities of a public entity. *See* N.C. Gen. Stat. § 108A-25.

132. Rumina Slazas is an individual with a disability and/or record of disability, and was regarded as disabled by Defendant, due to her history of cancer.

133. J.S. is an individual with physical, intellectual, and developmental disabilities.

134. S.S. is an individual with intellectual and developmental disabilities.

135. Rumina Slazas, J.S., and S.S. are "qualified individuals with disabilities."

**Plaintiff Children Have a Right to Live in The Community**

136. Title II contains an "integration mandate" requiring public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). *See also* 42 U.S.C. § 12101(a)(2), (3), & (5).

137. Defendant's unnecessary segregation of individuals with disabilities constitutes unlawful discrimination under Title II of the ADA. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999).

138. Ms. Slazas and J.S. did not oppose integrated treatment and placement of J.S. while he was in Defendant's custody, and he was eligible and appropriate for such

23

placement and services as he had been receiving treatment and living in the community prior to and after Defendant's involvement, but. J.S. was institutionalized throughout his time in Defendant's custody.

139. To the extent they were needed, reasonable accommodations could have been made to permit J.S. to continue living in a family-like setting in the community.

140. Ms. Slazas and S.S. did not oppose integrated treatment and placement of S.S. while she was in Defendant's custody, and she was eligible and appropriate for such placement and services as she had been receiveing treatment and living in the community prior to and after Defendant's involvement, but. S.S. was institutionalized throughout her time in Defendant's custody.

141. To the extent they were needed, reasonable accommodations could have been made to permit S.S. to continue living in a family-like setting in the community.

142. Defendant's failure to utilize home and community-based services and the choice to continue institutionalization of Plaintiff children was done intentionally and with deliberate indifference to their federally protected rights under the ADA.

143. Defendant affirmatively rejected home and community based options presented by Sandhills LME/MCO and instead chose institutional, segregated settings for Plaintiff children with awareness of the requirements of the ADA and other laws requiring integration of children in their care.

**Plaintiffs Have a Right to Nondiscriminatory Child Welfare Services**

144. Title II provides that public entities may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or

24

service that is not equal to that afforded others," or "an aid, benefit, or service that is not as effective in affording equal opportunity" to gain the same result or benefit as provided to others. *See* 28 C.F.R. § 35.130(b)(1)(ii)-(iii) (implementing the nondiscrimination requirements of Title II, 42 U.S.C. § 12132).

145. Ms. Slazas was not afforded equal opportunity to gain the same results or benefits provided to other families by child welfare services because Defendant relied on discriminatory assumptions and beliefs about her disability and record of disability, regarded her as disabled, and refused to return her children to her custody based on these unfounded, biased beliefs about her cancer affecting her ability to care for her children.

146. As children in Defendant's child welfare custody, Plaintiff children were categorically eligible for Medicaid and were eligible, based on disability, for Medicaid waivers and other community-based Medicaid and state-funded services that would have a facilitated acess to community services. Plaintiff children were denied equal opportunity and benefit of Defendant's community-based child welfare programs when they were placed in institutional settings and kept separated from their mother after she had recovered and was ready to resume caring for them.

**Plaintiffs Have a Right to Reasonable Accommodations/Modifications**

147. Title II of the ADA also requires public entities to make reasonable modifications to its child welfare program to avoid discrimination on the basis of disability. *See* 28 C.F.R. § 35.130(b)(7)(i).

148. Defendant did not make reasonable modifications to provide J.S. equal access to community-based child welfare services and integrated placements. For example,

Defendant failed to arrange for alternative transportation services to ensure J.S. received ABA therapy, it failed to provide for J.S.'s physical therapy needs, and it failed to ensure that J.S. had access to coping mechanisms like his Chromebook.

149. Defendant did not make reasonable modification to provide S.S. access to community-based child welfare services and integrated placements. For example, Defendant failed to reasonably modify their child welfare services for S.S. to ensure her access to educational programming and therapy services most of her time in the UNC Health emergency department, to have social interactions with youth her own age, and to have physical activity or interaction with the outside community.

150. Defendant did not make reasonable modifications to provide Ms. Slazas, if needed, to nondiscriminatory child welfare services.

**Plaintiffs Have a Right to Effective Communication**

151. Discrimination under Title II also includes failure by a public entity to take appropriate steps to ensure its communications with participants with disabilities are as effective as communications with participants without disabilities. Public entities must furnish appropriate auxiliary aids and services when necessary to afford equal opportunity to participate in the services. *See* 42 U.S.C. §§ 12103, 12131(2); 28 C.F.R. § 35.160. For the communications to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. § 35.160.

Case 1:24-cv-00658   Document 1   Filed 08/08/24   Page 26 of 30

152. S.S. has  disabilties that require auxilliary aids and services, such as a communication board, assistive technology or apps, and social stories[1], to facilitate understanding and communication with service providers and medical staff. No such services or aids were ever provided to S.S. while she was in Defendant's custody.

**Discriminatory Criteria and Methods of Administration**

153. Public entities cannot use criteria or methods of administration that discriminate on the basis of disability. *See* 28 C.F.R. § 35.130(b)(3).

154. Defendant's refusal to return Plaintiff children to Ms. Slazas after she fully recovered from cancer was based on discriminatory criteria and methods of administration.

155. Defendant's reliance on discriminatory criteria or methods of administration in its child welfare services is evidenced by Defendant's consisent placement of Plaintiff children in an institution when home and community-based placements and services were available, especially after Ms. Slazas fully recovered from cancer and requested the return of Plaintiff children to her custody and her home.

**Discrimination Based on "Association With" Disabled Persons**

156. In addition to the Title II  rights listed above, a public entity cannot discriminate against individuals because their family members or known associates have

---

[1] Social stories are verbal descriptions of a social activity or task that describe thoughts, feelings, and the order of events to help children understand appropriate behavior in that situation. *See* HHS, *Children with Disabilities: Social Stories*, EARLY CHILDHOOD LEARNING AND KNOWLEDGE CENTER (Jul. 24, 2023), https://eclkc.ohs.acf.hhs.gov/children-disabilities/article/social-stories.

27

a disability. *See* 28 C.F.R. § 35.130(g); *see also A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 363–64 (4th Cir. 2008) (deciding that the text and intent of the ADA support association discrimination claims under Title II and that Title I and III discrimination by association provisions can be applied to Title II).

157. Plaintiff children experienced discrimination by association with Ms. Slazas when Defendant refused to return them to the custody of their mother based on Defendant's misconceptions and bias about Plaintiff mother's ability to parent them based on her record of disability.

158. As a result of Defendant's actions described above, Plaintiffs have suffered compensable harms, including:

- Trespass to their civil rights;

- Ms. Slazas suffered emotionally and psychologically from the discriminatory separation from her children;

- J.S. suffered from the loss of stable caregivers and adults with whom he could form attachments and mental and physical decompensation.

- S.S. suffered from deprivation of human contact, the loss of stable caregivers and adults with whom she could form attachments, and mental and physical decompensation.

28

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the Court to provide relief as set forth below:

1. Enter a judgment finding that Defendant's actions discriminated against and violated Ms. Slazas's rights under the ADA;

2. Enter a judgment finding that Defendant's actions discrminated against and violated S.S.'s rights under the ADA;

3. Enter a judgment finding that Defendant's actions discrminated against and violated J.S.'s rights under the ADA;

4. Award S.S. damages to compensate for the harm she experienced and will continue to experience throughout her lifetime as a result of Defendant's discrimination;

5. Award J.S. damages to compensate him for for the harm he experienced and will experience throughout his lifetime as a result of Defendant's discrimination;

6. Award Rumina Slazas damages for the harm she experienced and will experience throughout her lifetime as a result of Defendant's discrimination;

7. An award of Plaintiffs' reasonable attorney's fees and costs; and

8. Such other further relief as the Court may deem just and proper.

29

This the 8th day of August, 2024

DISABILITY RIGHTS NORTH CAROLINA

/s/ Holly Stiles
Holly Stiles
N.C. State Bar No. 38930
Marisa Leib-Neri
N.C. State Bar No. 61389
801 Corporate Center Drive, Ste. 118
Raleigh, NC 27607
919-856-2195
919-856-2244 (fax)
holly.stiles@disabilityrightsnc.org
marisa.leib-neri@disabilityrightsnc.org